IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03225-MEH

TAMMY SHARLENE HARDEN,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff Tammy Harden appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **affirms** the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.     Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB benefits filed on January 9, 2012, claiming arthritis, wrist issues, back problems, and bad knees

and hips, with an alleged onset date of March 1, 2011.  [AR 12, 148-49, 188]  Because Plaintiff applied for DIB only, she had to establish that her disability began before her September 20, 2012, date last insured.  [AR 15]  After the application was initially denied on July 6, 2012 [AR 78], an Administrative Law Judge ("ALJ") held a hearing on July 18, 2013, upon the Plaintiff's request [AR 30-64].  On August 12, 2013, the ALJ issued a written, unfavorable decision, finding Plaintiff had not been disabled from the alleged date of the onset of disability through the date she was last insured because considering Plaintiff's age, education, work experience and residual functional capacity ["RFC"], there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  [AR 9-29] On September 23, 2014, the SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-6, 7-8]  *See* 20 C.F.R. § 404.981.  Plaintiff timely filed her Complaint with this Court seeking review of the Commissioner's final decision.  [Docket #1]

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on September 5, 1969, and was 42 years old on the alleged onset date. [AR 25] The ALJ found that Plaintiff had an associate's degree in applied arts and science as a legal assistant, and past relevant experience as an administrative clerk, accounting clerk, and file clerk. [AR 34, 61]  Plaintiff, a former administrator in the Air Force and Navy, has a long record of medical records mostly from the Department of Veterans Administrative ("VA") providers and involving both physical and mental issues. [AR 1298]  However, as Plaintiff's issues on appeal do not question the ALJ's handling of the mental RFC but merely the physical, the Court will focus

only on the physical. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of [plaintiff's] contentions that have been adequately briefed for our review.")

A.      Knee and Hip Issues

Plaintiff had long experienced knee pain and osteoarthritis of the hip.  [AR 360, 563]  A November 22, 2011 MRI showed the left knee had marrow conversion but no internal derangement. [AR 828]  She received periodic lidocaine injections in her knees in late 2011. [AR 933]  In September 2012, additional MRIs of her knees showed minor abnormalities. [AR 1154-55].  In January 2013, she reported daily, deep pain in her knees and hips, which worsened with activity. [AR 1308]

B.      Upper Extremity Issues

The record first indicates Plaintiff experienced pain in her left wrist at an appointment on May 22, 2009, although she at that time reported to the doctor that the pain was "chronic." [AR 803, 491]  She periodically complained of pain in her left wrist at subsequent visits and on August 2, 2010, went to the ER for wrist and hand pain. [AR 528]  September 7, 2010 x-rays showed minimal joint degenerative changes. [AR 486]  A visit on September 27, 2010 notes her pain had increased, her first and second digits were tingling, and she was struggling with household chores.  [AR 474] However, the same notes show a 5/5 in grip strength despite tingling.  [*Id.*]  After seeing a chiropractor, Plaintiff told her provider on October 7, 2010, that her hand pain had improved "tremendously."  [AR 469]  Pain returned, however, by December [AR 413], and in January 2011, she received a left wrist splint [AR 387].  An April 11, 2011 MRI showed a large geode (cyst) of

the lunate bone, a small perforation in her joint, a cyst in the soft tissues of part of the wrist, and a small volume of fluid present.  [AR 233]  On July 6, 2011, Plaintiff reported increased hand pain after a fall.  [AR 1082]  An August 18, 2011 occupational therapy consult included that Plaintiff had difficulty gripping or lifting objects with her left hand and had 8/10 pain at rest and 10/10 pain with activity.  [AR 1-54]  Yet, shortly after that appointment, she again had full grip strength at 5/5 [AR 909], although her wrist pain led her to have surgery on December 19, 2012, after the date of her last insured.  [AR 1327, 1555]  In April 2013, she fell on her wrist and injured it again.  [AR 1224]

C.      Spine Issues

Plaintiff reported her spine problems began in June 2008 when she was in an automobile accident.  [AR 562]  In 2010, she visited a non-VA doctor and received a sciatic nerve block, which she reported temporarily alleviated her pain.  [AR 297, 562]  Since the accident, Plaintiff reported intermittent pain, occurring most days, and said she had experienced two flares in a year's span lasting for two days each.  [AR 563] Other visits to doctors included complaints of back pain.  [AR 464, 434, 404]  An April 11, 2011 MRI of her lumbar spine showed basically normal results with the exception of a high signal lesion that the doctor wanted to investigate further.  [AR 232] Plaintiff periodically reported ongoing back pain to her doctors in 2010-2013. [AR 464, 434, 369, 328] At a February 14, 2011 appointment, she reported her back pain was not constant, but brought on or exacerbated by daily activities such as stooping, bending or lifting. [AR 373]

In May 2011, Plaintiff consulted with a neurosurgeon regarding her lower pack pain. [AR 1104] The doctor reviewed the April 2011 MRI and found Plaintiff's sciatica could be the result of compression of the sciatic nerve outside the spine, but he found surgical intervention was not

4

indicated.  [AR 1005]  Another MRI, this time on August 8, 2011, showed disc desiccation at L5-S1

compatible with degenerative changes.  [AR 1018]  By March 7, 2012, she presented with chronic

back pain that worsened with lifting.  [AR 1548]  The doctor noted that they discussed the chronic

nature of the back pain and that there would be no way to eliminate it completely.  [*Id*.]

D.      Other Impairments

Plaintiff began complaining of left foot pain in 2010, the result of bunions she had been

experiencing for some time.  [AR 241, 452]  On March 22, 2011, she was assessed with a bunion

deformity and mild hammertoe, resolvable only via surgery.  [AR 351]  She underwent surgery in

August 2011.  [AR 1034-36]  By January 2012, she was walking and reported only mild foot pain

when walking or driving.  [AR 890]  Pain in her knees led to a diagnosis of muscle weakness, but

x-rays were normal.  [AR 243]  She received injections in her knee to help with the pain.  [AR 946]

The record also shows her having issues with neck pain.  [AR 276, 271, 360]  These complaints led

a doctor at the orthopedic clinic to note that Plaintiff may have issues with fibromyalgia.  [AR 1247]

Plaintiff also went to the emergency department to receive medication for migraine headaches.  [AR

1353]  Additionally, Plaintiff thought she had experienced asthma attacks, but a doctor noted they

were more likely panic attacks.  [AR 361]

**III.    Medical Opinion Evidence**

The record does not contain functional capacity evaluations made at the request of Disability

Determination Services.  However, just before Plaintiff claimed she became disabled, she underwent

a number of evaluations, most of them compensation and pension ("C&P") examinations performed

by the VA to determine the level of her service-related disability.  While her service-related

disabilities are not at issue in this appeal, the examiners commented on other complaints of pain, such as Plaintiff's wrist and back pain, thus these evaluations were considered by the ALJ. [AR 22-26]

In February 2010, staff physician Dr. Richard Oh evaluated Plaintiff. [AR 377-85] Plaintiff reported disability from mood disorder, anxiety, and pain in her knees and hips. [AR 378] Dr. Oh opined Plaintiff "would not be limited in any primarily sedentary job and would be able to stand up to two hours and to walk around an office as needed to perform a job as an office assistant as she has been able to do that job without special accommodations." [AR 382] In January 2011, just prior to alleged her onset of disability, Plaintiff underwent another C&P examination, this time by Dr. Caryl Murchinson, who noted Plaintiff could perform sedentary work, stand two hours per day, and walk around the office as needed. [AR 382-86] Later, in April 2012, another C&P examiner, Dr. Teresita Marcelo, said Plaintiff's knee and lower-leg conditions impacted her ability to work in that she could sit for 30 minutes to an hour, stand for 30-to-45 minutes, walk for not more than two blocks at a time, lift 30 pounds, and that Plaintiff must change positions. [AR 1506-08, 1510-1521] She also found Plaintiff independently handled activities of daily living, such as "dressing, undressing, bathing, writing, eating, [and] driving." [AR 1508] Dr. Marcelo additionally noted that Plaintiff's foot condition did not impact her ability to work. [AR 1437]

In January 2013, after Plaintiff's last date insured, a nurse practitioner at the VA, Debra McMurdo, noted Plaintiff "should not be lifting or bending (nothing heavier than a carton of milk) at this time." [AR 1313] McMurdo's report indicated Plaintiff had recently had left-wrist surgery, so Plaintiff should not be lifting with that hand, but she would be evaluated further as the wrist

healed. [*Id*.] Finally, in February 2013, Dr. Karen Ksiazek performed another C&P, finding Plaintiff's hip and knee issues did not limit her ability to work and noting her agreement with Dr. Murchinson's previous conclusions. [AR 1268-80]

## IV.   Hearing Testimony

The ALJ held a hearing on July 18, 2013.  [AR 30-64]  Plaintiff noted she has joint custody of her nine-year-old son, who lives with her half the time, and full custody of her four-year-old granddaughter.  [AR 35]  She also has two adult children.  [*Id*.]  She served as an administrator in the Air Force and Navy for four years until 2002, when she received a hardship discharge because of her divorce.  [AR 37, 1298]  Plaintiff testified she receives disability benefits from the VA in the amount of $1,089.00 a month, a 60-percent service-related disability for her mental health and knees and hips.  [AR 35-37]  She does not drive  because she does not have a car so instead takes the bus. [AR 36]  Plaintiff told the ALJ her "main issues" were depression and Post Traumatic Stress Disorder ("PTSD") caused she thinks by being in a car accident five years prior.  She also said she had pain in her back, knee, and neck that limits her, but that she "can move."   [AR 46-48].

When the ALJ asked her if she could perform a job in which she had to sit most of the day 40 hours per week, Plaintiff testified she could not do so:

> . . . mainly because of my depression and anxiety.  It's hard for me to work full time and juggle everything and work responsibilities.  Like getting the kids [to] daycare, to school, and getting there, and driving there, or riding the bus.  It's both physical and mental, but moreso the extra stress working full-time and juggling everything.

[AR 57-58]  However, she said she could clean her apartment, wash clothes, cook simple meals, go grocery shopping, and care for her granddaughter, although her approach is to do things "a little at

a time." [AR 43, 52-54] She told the ALJ she has the ability to walk two blocks to the bus stop, stand for 15-to-30 minutes, and sit 30 minutes to one hour. [AR 48-49]. She noted she takes medications for pain, and when the medications are working, her pain is generally at a five-to-six out of 10. [AR 51] However, she said sometimes the pain is "at least a ten" everywhere – in her back, knees, and hips – four-to-six days a week "depending on what's going on." [*Id.*] For pleasure, Plaintiff said she reads on her iPad, watches television with her granddaughter, and spends time on Facebook. [AR 55-56] She also serves as a volunteer for the American Legion. [AR 60]

Plaintiff's attorney then examined her. [AR 58-60] In response to the attorney's questions, Plaintiff said she had four-to-six bad days each week, although it was not clear whether she thought this was because of psychological issues or pain. [AR 59] She said she struggled to sit for an entire day, using the example that she had attended an American Legion convention where she sat frequently on a Friday and Saturday; by Sunday, it was difficult for her to get up and down. [AR 60] A vocational expert ["VE"] testified at the hearing that Plaintiff's past relevant work included administrative clerk, accounting clerk, and file clerk – all with light exertional levels. [AR 61] The ALJ then gave the VE the following scenario:

> What I would like to do is stick with sedentary work, but look at unskilled, very simple, repetitive kinds of jobs where you're doing pretty much the same thing every day and the job itself doesn't change. I would like you to look at jobs that have very little decision making required, and then physically no climbing or balancing. I would say no crouching, crawling, or kneeling either, and occasional bending. And let's see, and then I would say limited contact with the public and her coworkers.

[AR 61] Based on that scenario, the VE concluded that a person with Plaintiff's RFC could perform occupations that included an addresser (25,000 jobs nationally, 200 in Colorado), a final assembler

(14,000 jobs nationally, 100 in Colorado), and a lens inserter (8,000 jobs nationally, 80 in Colorado). [AR 61-62]

Plaintiff's lawyer submitted additional medical evidence to the ALJ after the hearing, which the ALJ considered. [AR 12] The ALJ issued an unfavorable decision on August 12, 2013. [AR 09-29]

## LEGAL STANDARDS

### I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See id.* If the impairment is not listed, she is not presumed to be

conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed RFC prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g).

## II.      Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.  If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when

10

the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

At Step One, the ALJ found Plaintiff engaged in substantial gainful activity between May 20, 2011, and August 4, 2011, after her alleged onset date of March 1, 2011. [AR 16] However, the ALJ noted Plaintiff left her last job because she was fired, but it was unclear for what reason and indicated it may have been because she was leaving to have an elective foot surgery.  [*Id.*]  Plaintiff also indicated to a psychologist that she thought she was doing a satisfactory job at work, which also persuaded the ALJ to find that Plaintiff's last job did not end due to a medical impairment or combination of impairments.  [*Id.*]  Thus, the ALJ concluded her work activity for that employer was not an unsuccessful work attempt.  [*Id.*]  Nevertheless, because there was a period of more than 12 months in which Plaintiff did not work between March 1, 2011, and the date of last insured of September 30, 2012, the ALJ went on to address the subsequent steps of the five-step sequential evaluation. [*Id.*]

At Step Two, the ALJ determined Plaintiff had the following severe impairments from March 1, 2011, through September 30, 2012:

> [S]tatus-post right lapidus and McBride bunionectomy and 2nd digit proximal interphalangeal joint arthrodesis on August 24, 2011, marked bunion deformity on left foot, bilateral chondromalacia patellae of the knees, left knee osteoarthritis, bilateral hip strain, mild lumbar degenerative disc disease, mild degenerative joint disease [of the] left wrist, probable lunottriquetral ligament tear in the left wrist, headaches, and mood disorder.

[AR 16 (internal citations to the medical record omitted)]  The ALJ also considered evidence of

11

cervical strain and reactive airway disease, but found neither was severe.  [*Id.*]  She also found no

acceptable medical source had diagnosed Plaintiff with panic and anxiety, so the ALJ did not

consider these as medically determinable impairments.  [*Id.*]  The ALJ concluded Plaintiff did not

have an impairment that met or equaled the severity of one of the listed impairments:

> No treating physician or examining physician has mentioned findings equivalent in
> severity to the criteria of any listed impairment. []  The undersigned finds no
> evidence that [Plaintiff] was unable to ambulate effectively [].  [Plaintiff] testified
> that she goes shopping weekly. There is no evidence that she needed to use a walker,
> two crutches, or two canes for ambulation, except on a temporary basis.  Other
> evidence in the record indicates [Plaintiff] has used the bus to travel. There is no
> evidence that [Plaintiff] was unable to perform fine and gross movements effectively.
> [She] can do housework, [and] prepare simple meals.  Multiple treatment records at
> the VA have described [her] as adequately or well groomed, with good hygiene.
> [She] reported to a VA doctor that she was independent in dressing, bathing, eating,
> driving, and writing.

[AR 17 (internal citations to the record omitted)]

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments

that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial

gainful employment (Step Three).  [AR 17]  The ALJ then determined that Plaintiff had the RFC

from March 1, 2011, through September 30, 2012, to perform "a limited range of work at sedentary

exertion as defined in 20 CFR 404.1567(a),  except that she is limited to lifting and carrying 10

pounds occasionally, sitting about six hours, standing or walking about two hours in an eight-hour

workday with normal breaks.  [*Id.*]  She could not climb, balance, crouch, crawl, or kneel, but she

could occasionally stoop.  [*Id.*]  Mentally, she could perform "the basic demands of competitive,

remunerative, unskilled work," and could "understand, remember, and carry out simple and

repetitive tasks that required little decision making."  [*Id.*]  She could interact appropriately with

supervisors but "should have limited contact with co-workers and the public." [*Id.*]  In making this finding, the ALJ provided just more than seven pages of detailed narrative, with extensive citations to the record.  [*See* AR 17-24]  The ALJ's narrative included discussion of the following:

- Physical issues involving her degenerative disc disease, back injury, bad knees and hips, arthritis, depression, and anxiety, and medicines she takes for these issues;
- Details of Plaintiff's pain for lower back and hip issues and how that affects her activities of daily living;
- Depression and treatment and how that affects her ability to work;
- Personal history impacting her depression, including previous spousal abuse and a car accident;
- Living situation and busy dynamic of her home;
- Activities of daily living such as preparing easy meals, shopping, driving kids to school and activities, dancing at least once a month, attending American Legion lunches, meetings and conventions.
- Plaintiff's perceived limitations as to sitting, standing, and so on; and
- Current disability benefits received

[AR 17-19 (internal citations to the record omitted)]

The ALJ then went on to review the medical opinions.  [AR 19-24]  The ALJ analyzed a report from Plaintiff's psychiatrist, Dr. Francine Pokracki, who in 2011 assessed Plaintiff with a GAF score of 48.[1]  [AR 19]  The ALJ noted that Plaintiff told the psychiatrist that she continued to be

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument

"overwhelmed with chaos in her life" as a result of "poor boundaries, consequences, etc.,"  which

greatly impacted her ability to cope, and precluded her being able to work reliably.  [*Id.*]  The ALJ

explained why she declined to give controlling weight to this treating source opinion for its lack of

supporting diagnostic or other examination findings.[2]  The ALJ countered that opinion with other

---

with family members)."

• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."

• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

• 0: "Inadequate information."

[2]The Court again here notes that Plaintiff does not challenge the ALJ's opinion regarding Plaintiff's mental conditions; thus, the Court will not explore that issue further, but includes the

evidence in the record, including that Plaintiff started a full-time job the next month and worked for more than two months, reporting she had satisfactory performance.  The ALJ then reviewed her opinion about Plaintiff's lack of credibility, explaining that Plaintiff's "asserted inability to work full-time is not supported by any medical opinion given great weight, and is inconsistent with the overall record."  [AR 20]  The ALJ further clarified:

> It is important to make a distinction between the trying circumstances in [Plaintiff's] life (she was raising three children on her own), and her medical impairments.  To establish disability under the program at issue, [Plaintiff] must demonstrate that she cannot work because of a physical or mental impairment [].  The statement of Dr. Pokracki that [Plaintiff] was "overwhelmed" by the chaos in her life, or [Plaintiff's] statement that she would have difficulty "juggling everything" with a full-time job are not relevant to the issue under consideration in this decision, i.e. whether the claimant is precluded from work because of a physical or mental impairment (or the combination thereof) [].

[AR 20 (internal citations omitted) (emphasis in original)]  The ALJ then reviewed records from Plaintiff's long-time psychotherapist and social worker, David Kartchner, whose notes indicated life stressors regarding raising children, child support, work (job stress, as opposed to unemployment), and rent payments; yet, Kartchner noted she was "managing despite her current stress" and "was managing her mood" and "coping adequately with life stressors."  [AR 21]  The ALJ noted that records from an additional psychiatrist, Dr. Michael Sturges, described Plaintiff as "smart, alert, and emotionally challenged by her need to provide and care for her family," and later indicated Plaintiff was "amazingly competent, keeping many balls in the air."  [*Id.*]  From these records, spanning 2011 and 2012, the ALJ concluded:

---

information here to demonstrate the thorough nature of the ALJ's findings.  The Court also did not include the information from mental health providers in its discussion presenting medical opinion evidence as it is irrelevant to the issues Plaintiff raises on appeal.

> The above evidence shows [Plaintiff] was beset by multiple life stressors, but it does not reflect an inability to work due to a mental or physical impairment.  To the contrary, the evidence suggests [Plaintiff] was functionally adequate in her role as a "full-time mother" to three children, in addition to doing some volunteer work at the American Legion.

[*Id.*] After reviewing other medical records from treating physicians, including GAF scores ranging from 45 to 55, the ALJ concluded Plaintiff had a severe mental impairment of mood disorder.  [AR 22]  The ALJ thus noted limitations in that Plaintiff had no extended-duration episodes of decompensation and only mild restriction of activities of daily living, but she had moderate difficulties in maintaining social functioning and concentration.  [*Id.*]  Overall, the ALJ found regarding Plaintiff's mental conditions that the "objective medical findings do not support limitations greater than those found in the [RFC]."  [*Id.*]  Regarding physical issues, the ALJ wrote:

> Notwithstanding her reports of back, hip, knee, foot, wrist, and arthritic pain, [Plaintiff] told Dr. Teresita Marcelo that she could sit 30-60 minutes, stand 30-45 minutes, walk not more than two blocks, and lift 30 pounds.  [Plaintiff] reported she was independent in dressing, bathing, writing, eating, and driving. [Plaintiff's] statements as to her exertional capacity (lifting, carrying, standing, walking, sitting, pushing and pulling) to Dr. Marcelo are generally consistent with her written statements to the Social Security Administration in June 2012 and in her testimony. Later, on August 22, 2012, [Plaintiff] told Dr. Marcelo that she could stand 45 minutes, walk less than a block, and lift 35 pounds.

[AR 22-23 (internal citations to the record omitted)] The ALJ wrote that Dr. Marcelo accepted Plaintiff's reported limitations, but the ALJ declined to give controlling weight to this opinion "for it is not fully consistent with other evidence in the record, or with the doctor's examination findings."  [AR 23]  For example, the ALJ gave less weight to Dr. Marcelo's opinion that Plaintiff can only walk two blocks, as the ALJ found that inconsistent with the doctor's examination finding that Plaintiff had only slightly reduced range of motion in the knees, and the ALJ found the doctor's

conclusion misaligned with other medical records and with Plaintiff's own testimony that she at times had been able to run to the bus. [*Id.*]

The ALJ also gave less weight to Dr. Marcelo's opinion that Plaintiff could not sit for long or that she needed to change positions beyond those normally available at work, noting the medical record showed only mild degeneration in the lumbar spine. [*Id.*] Furthermore, the ALJ was unconvinced of these restrictions because of Plaintiff's testimony that she attended an American Legion convention and sat at some length for two days, even though that later caused her pain. [*Id.*] The ALJ also noted a doctor found that Plaintiff was not a candidate for back surgery as her degeneration was mild. [*Id.*] Regarding the spine problems, the ALJ wrote that Plaintiff last worked from May 2011 until August 2011 at a sedentary job, with no evidence on the record "that she was unable to perform the sitting or other exertional requirements of the job." [*Id.*] However, the ALJ gave substantial weight to Dr. Marcelo's opinion that Plaintiff could not stand or walk for a prolonged period of time as that conclusion was consistent with the entire record, including Plaintiff's impairments regarding her feet, knees, and hip. [*Id.*]

Regarding Plaintiff's foot condition, the ALJ noted that Plaintiff recovered after her foot surgery and could discontinue using a walker and resume full weight-bearing activity in regular shoes. [AR 23-24] Plaintiff did have a bunion after the surgery, the ALJ wrote; however, Dr. Marcelo indicated it did not affect her ability to work. [AR 24] The ALJ gave this opinion less weight as Plaintiff's continual problems with her left foot and history of surgery on her right foot, in conjunction with her other impairments, "reasonably precludes standing or walking for long periods," although not as limited as only two blocks, as indicated above. [*Id.*]

The ALJ continued by analyzing the report of Dr. Murchison based on a C&P examination of Plaintiff on January 31, 2011, at which the doctor indicated Plaintiff self-reported she could sit to an unlimited extent but preferred to get up every 20 minutes to stretch her back, could stand for two hours, walk two blocks, and run but chose not to because of her knees, hips and back. [*Id.*] Regarding her view of this doctor's opinion, the ALJ explained:

> Based on her examination of [Plaintiff] and review of records, Dr. Murchison opined [Plaintiff] could perform a sedentary job, and that she could stand up to two hours and walk around the office as needed. Although Dr. Murchison's opinion was just prior to the alleged onset of disability, the undersigned gives the opinion the greatest weight, for it is consistent with her examination findings and with the overall evidence, including a later examination and opinion by Dr. Ksiazek from February 28, 2013 that she agreed with Dr. Murchison's prior assessment. The undersigned finds no intervening event or substantial change in objective medical findings that would preclude [Plaintiff] from performing sedentary work.

[*Id.*]

Additionally, the ALJ reviewed the records indicating as of January 8, 2013, that Plaintiff should not bend or lift anything heavier than a milk carton. [*Id.*] However, the ALJ noted this was an instruction based on Plaintiff having just had surgery on her left wrist in December 2012, thus it was a temporary restriction. [*Id.*] Regardless, the ALJ also pointed out that this restriction fell outside the time period at issue in the disability decision. [*Id.*]

Finally, regarding the medical record, the ALJ discussed an examination on January 14, 2013, regarding Plaintiff's reports of daily hip and knee pain. [*Id.*] The medical notes indicate no significant abnormalities that would warrant surgery, which the ALJ found consistent with her RFC decision and inconsistent with Plaintiff's allegations requesting additional limitations. [*Id.*]

At Step Four, the ALJ determined Plaintiff was unable to perform her past relevant work,

but that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform

jobs existing in significant numbers in the national economy, including addressor, final assembler,

and lens inserter.  [AR 24-25]  As a result, the ALJ concluded that Plaintiff was not disabled at Step

Five of the sequential process and, therefore, was not under a disability as defined by the SSA at any

time from March 1, 2011, through September 20, 2012.  [AR 25-26]

Plaintiff sought review of the ALJ's decision by the Appeals Council on September 9, 2013

[AR 7-8], which was denied [AR 1-6].  Plaintiff timely filed her Complaint in this matter on

November 26, 2014.  [Docket #1]

## ANALYSIS

On appeal, Plaintiff asserts that the ALJ erred in (1) finding Plaintiff's May-August 2011

work was an unsuccessful work attempt; (2) concluding Plaintiff's RFC did not require additional

restrictions based on manipulative and sit/stand limitations as well as pain[3]; and (3) determining

there were jobs within Plaintiff's RFC available in significant numbers.  Opening Brief, docket #13

at 1.  Thus, Plaintiff concludes the disability denial is not based on substantial evidence.  *Id.*

**A.      Unsuccessful Work Attempt**

Plaintiff argues the ALJ erred in characterizing Plaintiff's May-August 2011 work as an

unsuccessful work attempt.  Opening Brief, docket #13 at 23-25.  Defendant counters that this was

---

[3]Plaintiff characterizes these arguments as three distinct issues of the ALJ's failure to (1) assign any manipulative restrictions in the RFC and develop the record, (2) place a sit/stand option in Plaintiff's RFC, and (3) make necessary findings regarding Plaintiff's pain and consider it in setting the RFC.  Opening Brief, docket #13 at 1.  The Court construes all three as relating to the sufficiency of the RFC and therefore collapses its analysis of these three issues into one.

not error and, in the alternative, any error here was harmless as the ALJ continued her analysis past this Step One phase through the sequential evaluation.  Response, docket #17 at 7-8.

Section 20 CFR 404.1574(c) governs unsuccessful work attempts, with 20 CFR 404.1574(c)(3) more specifically dealing with employment of less than three months.  If a plaintiff works for less than three months, it will be considered an unsuccessful work attempt if plaintiff has the ability to work but stopped or reduced work because of the impairment.  Plaintiff asserts her upcoming foot surgery and effect of her foot condition on her ability to walk and use public transportation caused her to stop working at her last job.  Opening Brief, docket #13 at 29.  The ALJ did not make a specific finding regarding exactly why Plaintiff left the job, but in not believing it was impairment-related, the ALJ concluded this was an unsuccessful work attempt.  [AR 15-16]  Still, the ALJ continued her analysis through all five steps of the sequential evaluation, making any error at Step One harmless.  *Cf. Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion that [Plaintiff] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence").

As the Court's subsequent analysis concurs with Defendant that the ALJ did reach the proper conclusion, any error at Step One is indeed harmless.  Additionally, the ALJ provided substantial evidence as to her reasoning in concluding Plaintiff's May-September 2011 work was an unsuccessful work attempt, thus the Court does not find she erred.

**B.**      **Appropriateness of the RFC**

Plaintiff next argues the ALJ erred in development of Plaintiff's RFC involving three

aspects: (1) manipulative limitations; (2) sit/stand restrictions; and (3) pain. Opening Brief, docket #13 at 25-34. Defendant counters that the ALJ's opinion regarding all aspects of the RFC was handled properly and is supported by substantial evidence. Response, docket #17 at 9-17.

An RFC assessment is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities." SSR 96-8p, 1996 WL 374184 at * 2. It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'" *Id.* "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

Here, the ALJ determined Plaintiff had the RFC from March 1, 2011, through September 30, 2012, to perform "a limited range of work at sedentary exertion as defined in 20 CFR 404.1567(a), except that she is limited to lifting and carrying 10 pounds occasionally, sitting about six hours, standing or walking about two hours in an eight-hour workday with normal breaks. [AR 17]  She could not climb, balance, crouch, crawl, or kneel, but she could occasionally stoop. [*Id.*] Mentally, she could perform "the basic demands of competitive, remunerative, unskilled work," and could "understand, remember, and carry out simple and repetitive tasks that required little decision making." [*Id.*] She could interact appropriately with supervisors but "should have limited contact with co-workers and the public." [*Id.*]

The Court will address each of Plaintiff's three RFC challenges in turn.

### 1)      Manipulative Restrictions

Plaintiff contends the ALJ erred in failing to consider her manipulative limitations. Opening Brief, docket #13 at 25.  Defendant counters that the ALJ reasonably concluded Plaintiff could perform a reduced range of sedentary work, a decision based on substantial evidence that should be affirmed.  Response, docket #17 at 8.

The Court finds first that the ALJ committed no error in assessing the RFC with respect to Plaintiff's manipulative restrictions.  The ALJ properly considered the medical evidence concerning the condition, which was minimal, and discussed the surgical intervention that corrected the wrist problems.  Further, the ALJ found one of Plaintiff's severe impairments was wrist arthritis as well as a possible tear in the ligament of her left wrist.  While the ALJ did not explicitly list manipulative restrictions in the RFC, she did by the inherent nature of allowing only "sedentary work," include a restriction that Plaintiff could lift no more than 10 pounds.  *See* SSR 96-9p, 1996 WL 374185, at *3.  Meanwhile, Plaintiff did not testify at the hearing that she required additional limitations than that, nor did any doctor opine as such.  The record shows problems with her wrist before surgery, but Plaintiff self reported she could lift 30-to-40 pounds occasionally and had full grip strength and motion of her wrist, hand and fingers.  Meanwhile, Plaintiff did not provide evidence of need for any further manipulative restrictions.

Plaintiff next argues the ALJ was required to further develop the record regarding the manipulative limitations.  Opening Brief, docket #13 at 28.  However, in *Cowan v. Astrue*, 552 F.3d 1182 (10th Cir. 2008), the Tenth Circuit determined that an ALJ need not seek out additional information or a consultative examination if the evidence is sufficient to make a disability

determination.  *See also Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (indicating that the court "will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record.").  This is particularly true when a plaintiff, as here, is represented by counsel.  *Id*.

Given all of the evidence relied upon by the ALJ and discussed in her opinion, the Court is not persuaded that the ALJ erred in her handling of manipulative restrictions in the RFC nor that she needed to further develop the record.

### 2)    Sit/Stand Restrictions

The ALJ included in Plaintiff's RFC that she could sit for six hours and stand and walk for two hours with normal breaks. [AR 17]  Plaintiff contends "there is no evidence in the record that [Plaintiff] is capable of either sitting or standing for this period of time."  Opening Brief, docket #13 at 30.  Plaintiff essentially argues the ALJ erred in not giving controlling weight to a treating physician, Dr. Marcelo, who opined Plaintiff could not sit for more than one hour, stand more than 30 minutes, walk more than two blocks, and said that she must be allowed to change positions.  *Id*. Defendant responds the ALJ explained the reasons she gave varying weight to the medical opinions, and those reasons were consistent with the medical record, meaning the ALJ's conclusions should not be disturbed on review.  Response, docket #17 at 12.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)).  The applicable regulations governing the SSA's consideration of medical opinions

distinguish among "treating" physicians, "examining" physicians and "nonexamining" (or "consulting") physicians. *See* 20 C.F.R. § 416.927(c). If the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

However, if the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id.* "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo*, 682 F.3d at 1291).

It is error for an ALJ not to adequately state and explain what weight he or she gives to medical opinions. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ must give "good reasons" for the weight he or she ultimately assigns each medical opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003). The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing

the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).   An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

As outlined thoroughly in the discussion above regarding the ALJ's opinion, the Court finds the ALJ provided detailed explanations of the weight she assigned the medical opinions.  The ALJ gave great weight to the opinions of Drs. Murchison and Ksiazek because they were consistent with the record as a whole.  The ALJ also explained her handling and weight of Dr. Marcelo's opinion, rejecting the sit/stand restrictions because they were not consistent with that same doctor's notes, did not align with Plaintiff's activities of daily living as presented during testimony at the hearing, nor did they map to the medical records as a whole.  While Plaintiff argues the ALJ's opinion exhibits "picking and choosing" in the record to force a finding of nondisability, which the Court agrees is disallowed per *Hamlin*, the Court's review of the record in its entirety and its review of the ALJ's opinion shows the ALJ properly conducted a thorough analysis based on substantial evidence and, as such, the opinion should not be disturbed on appeal.

### 3)    Pain

Plaintiff asserts the ALJ erred by failing to make the necessary findings regarding Plaintiff's pain and consider it within the RFC.  Opening Brief, docket #13 at 32.  Defendant argues this in an issue of the ALJ analyzing Plaintiff's credibility, and the ALJ gave good reasons for finding Plaintiff

not fully credible.  Response, docket #17 at 15.

When determining whether the claimant's pain is credible, the ALJ must consider assertions of severe pain and decide whether the ALJ believed them.  *Kepler v. Chater*, 68 F.3d 387,  391 (10th Cir. 1995).  To do this, the ALJ should consider factors such as:

> levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id*.  The ALJ should give a conclusion and the reasons for that conclusion, explaining "why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible," affirmatively linking credibility findings to substantial evidence in the record.  *Id*. Further, because credibility determinations are within the province of the ALJ, a reviewing court may not upset such findings where they are supported by substantial evidence.  *See Quantu v. Barnhart*, 72 F. App'x 807, 835 (10th Cir. 2003).

Once objective medical evidence shows that a claimant has an impairment that can reasonably be expected to produce symptoms, the ALJ is required to consider the claimant's assertions of the symptoms and decide whether to believe them.  *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993).  "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990); *see also Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008).  However, "[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

While Plaintiff asserts that the ALJ did not sufficiently link her opinion to the record, the Court's review of the ALJ's decision shows the ALJ followed the required approach.  The ALJ rejected Plaintiff's complaints in part because she did not find them fully credible, particularly in light of Plaintiff's activities of daily living and testimony at the hearing.  As detailed above, the ALJ provided a substantial narrative explaining her decision, meeting the requirement that she "set forth the specific evidence [she] relied on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).  Because the ALJ's reasons for discounting the Plaintiff's credibility are supported by the record, her determinations are entitled to substantial deference. *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir.  2001); *see also Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  Thus, on this record, the Court will not disturb the ALJ's opinion.

**C.    Jobs Available in Economy**

Lastly, Plaintiff argues that the ALJ improperly found there were jobs available in significant numbers in the economy, relying on the vocational expert's testimony that an individual having the same age, background, experience and RFC as the Plaintiff could perform the jobs of addressor (25,000 jobs available nationally and 200 in Colorado), final assembler (14,000 jobs nationally and 100 in Colorado), and lens inserter (8,000 jobs nationally and 80 in Colorado).  Opening brief, docket #13 at 34-35.  Defendant responds the ALJ did not err and instead reasonably relied on the VE's testimony identifying jobs Plaintiff could perform at significant numbers in the economy. Response, docket #17 at 18-19.

At Step Five of the sequential process, an ALJ bears the burden "to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found [the claimant] to have." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Specifically,

> the ALJ must find that the claimant retains particular exertional [and non-exertional] capacit[ies], decide whether the claimant has acquired transferable skills, identify specific jobs that the claimant can perform with the restrictions the ALJ has found the claimant to have, and verify that the jobs the claimant can do exist in significant numbers in the regional or national economies. All of these findings must be supported by substantial evidence.

*Id.* at 1088-89; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005). "Determining 'the functional demands and job duties' of specific jobs and matching those requirements to a claimant's limitations is the very task the ALJ must undertake at step five." *Haddock*, 196 F.3d at 1090. Accordingly, an ALJ may rely on the testimony of VEs and/or reliable publications, such as the Dictionary of Occupational Titles (DOT). *Id.*

In this case, Plaintiff cites *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992) to challenge that the ALJ erred in finding there were a significant number of jobs Plaintiff could perform in the economy. Opening Brief, docket #13 at 34-36. However, as Defendant correctly argues, the Tenth Circuit later clarified *Trimiar*, explaining the problem in that case was that the VE only testified to the number of available jobs in the regional economy when the VE should have testified to both the regional and national economy numbers. *Raymond v. Astrue*, 621 F.3d 1269, 1274 n. 2 (10th Cir. 2009). The Tenth Circuit has stated it does not have a bright line establishing the number of jobs necessary to constitute a significant number, nor does an ALJ have to engage in a factoral analysis

when the number of relevant jobs available nationally is much larger than the number of jobs available regionally.  *Id.*  Additionally, the Tenth Circuit has also held that 11,000 jobs in the national economy was substantial evidence for an ALJ to support a decision of nondisability.  *See Rogers v. Astrue*, 312 F. App'x 138, 1142 (10th Cir. 2009).

Here, with the ALJ's reliance on the VE's testimony regarding jobs available in the national and regional economies at the level of 47,000 total jobs, and with the entirety of the ALJ's well-reasoned opinion, the Court finds the ALJ did not err.

## CONCLUSION

In sum, the Court concludes that the ALJ's opinion was based on substantial evidence, thus, the decision that Plaintiff Tammy Sharlene Harden was not disabled is **affirmed**.

Dated at Denver, Colorado this 29th day of January, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge